151 F.3d 1215
 98 Daily Journal D.A.R. 8666
 Fred VANNATTA; George Boehnke; Center to Protect Free
Speech, Inc., Plaintiffs-Appellees,
v.
Phil KEISLING, in his capacity as Secretary of the State of
Oregon; Ted Kulongoski, in his capacity as
Attorney General of the State of Oregon,
Defendants,
and
Gordon Miller, Defendant-intervenor-Appellant.
 Nos. 95-35998, 95-35999.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Aug. 11, 1998.
 
 John R. Faust, Jr., Schwabe, Williamson & Wyatt, Portland, Oregon; John A. DiLorenzo, Jr., Hagen, Dye, Hirschy & DiLorenzo, Portland, Oregon, for plaintiffs-appellees VanNatta, et al.
 Rives Kistler, Deputy United States Attorney, Salem, Oregon, for defendants-appellants Keisling, et al.
 Donald Craig Mitchell, Anchorage, Alaska, for appellant Gordon Miller.
 Jamin B. Raskin, Washington, D.C.; Abigail Turner, and John C. Bonifaz, Boston, Massachusetts, for the amicus.
 Appeal from the United States District Court for the District of Oregon; Robert E. Jones, District Judge, Presiding. D.C. No. CV-94-01541-JO.
 Before: FERGUSON and BRUNETTI, Circuit Judges, and KING,* District Judge.
 Opinion by Judge FERGUSON; Partial Concurrence and Partial Dissent by Judge BRUNETTI.
 FERGUSON, Circuit Judge:
 
 I.
 
 1
 We adopt as the unanimous opinion of this panel all of Judge Brunetti's concurring opinion set forth in parts I, II, and III. We also adopt Part IV(A), which declares that Measure 6 is not closely drawn to advance the goal of preventing corruption and fails to pass muster under the First Amendment.
 
 II.
 
 2
 We reject Judge Brunetti's argument in dissent, Parts IV(B) and V, that Measure 6 is valid because it prevents a distortion of the republican form of government in the State of Oregon. It could be argued that the initiative process itself distorts the republican form of government.
 
 III.
 
 3
 Measure 6 was on the Oregon Ballot with Measure 9. That Measure was a set of statutes also adopted by the initiative process. The Oregon Supreme Court in Vannatta v. Keisling, 324 Or. 514, 931 P.2d 770 (1997) held that the statutes in Measure 9 which, like Measure 6, limited or banned campaign contributions, violated the Free Speech provisions of the State Constitution. One matter that is common in both Measures is the limitation upon candidates using campaign contributions from individuals who reside outside the candidate's voting district. In both Measures, the meaning of "individuals", is at issue. The Oregon Supreme Court declared that on its face it is unclear whether the word "individuals," as used in Measure 6, applies to the use of contributions from corporations, businesses, labor unions or PAC's, and therefore was over inclusive and must fail under the Oregon Constitution. In accordance with OR. REV. STAT. § 28.200 (1995), the panel certified to the Oregon Supreme Court three questions:
 
 
 4
 (1) Is Measure 6 valid under the Constitution of Oregon?
 
 
 5
 (2) How is Article II, section 22 to be interpreted in light of competing provisions of the Oregon Constitution, including Article I, section 8?
 
 
 6
 (3) Does the word "individuals" as used in section 1 of Measure 6 include corporations, PACs and unions?
 
 
 7
 The Oregon Supreme Court has rejected the certification.
 
 IV.
 
 8
 The issue, which appellants describe in several different ways, involves protecting the integrity of republican government by assuring that representatives are truly selected by their own constituents.
 
 
 9
 Appellants argue that the state interest in a republican form of government supports Measure 6. They contend that Measure 6 advances that interest by preventing those who are ineligible to vote from influencing the outcome of elections. The right to a republican form of government has never before been recognized as a sufficiently important state interest. In Whitmore v. Federal Election Comm'n, 68 F.3d 1212 (9th Cir.1995), a candidate and a voter sought an injunction to prohibit candidates from accepting out-of-state campaign contributions. The plaintiffs asserted that such contributions violated, inter alia, their right to a republican form of government. This Court stated:
 
 
 10
 Plaintiffs argue that the Constitution entitles them to representation by someone not beholden to any citizen of another state. They present a historian's affidavit that the Founding Fathers would have been "shocked" at out-of-state contributions to a congressional candidate ... Neither the Constitution nor the United States Code affords plaintiffs any support for their political theory.
 
 
 11
 This Court held plaintiffs' claim to be unsupported by precedent and dismissed it as frivolous. Whitmore, 68 F.3d at 1216. Although Whitmore addresses out-of-state rather than out-of-district contributions, its holding underscores the lack of support for any claim based on the right to a republican form of government.
 
 
 12
 Appellants nonetheless present several cases which, they argue, may be taken together to expand the "narrow exception to the rule that limits on political activity [are] contrary to the First Amendment." Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 296-97, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). We now distinguish each case in turn.
 
 
 13
 In Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Court upheld a Michigan law preventing corporations from using general treasury funds to support or oppose candidates for state office. The Court reasoned that corporations use state-created advantages to dominate both the economic and the political arena. Austin, 494 U.S. at 659, 110 S.Ct. 1391 (citing Federal Election Comm'n v. Massachusetts Citizens for Life, 479 U.S. 238, 257, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)). The Court held that the statute "ensures that expenditures reflect actual public support for the political ideas espoused by corporations ... corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political contributions." Id. at 660, 110 S.Ct. 1391.
 
 
 14
 The Court did not define "actual public support," but appellants would like us to read it as support for Oregon's limitation of out-ofdistrict contributions. The holding in Austin, however, addresses the "unique state-conferred corporate structure that facilitates the amassing of large corporate treasuries" and the attendant risk of unfair corporate influence in the electoral process. Id. The Court did not concern itself with a distinction between in-district and out-of-district corporations. Therefore, we conclude that the state interest defined in Austin does not support Measure 6.
 
 
 15
 In Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), the Supreme Court upheld Alabama legislation that extended police and other city powers over non-residents living within three miles of city borders. The Court concluded that the state did not have to provide those non-residents with the right to vote in city elections. Id. at 69, 99 S.Ct. 383.
 
 
 16
 The Holt Court emphasized that it was not enough for the non-residents to show that they were affected by the city's policies because many non-residents are affected by many cities' decisions. Id. Regardless of those extraterritorial effects, non-residents do not have a right to "participate in the political processes bringing it about." Id. "[O]ur cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." Id. at 68-69, 99 S.Ct. 383. It is true that states have wide latitude in determining requirements for voting. However, the political process at issue in Holt was the right to vote and not the right to First Amendment speech. Therefore, Holt does not support the republican form of government argument made here.
 
 
 17
 The Supreme Court has suggested that states have a strong interest in ensuring that elected officials represent those who elect them. See, e.g., Shaw v. Reno, 509 U.S. 630, 650, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (elected officials representing one interest group rather than their entire constituency is a cognizable harm under the Fourteenth Amendment). However, in Shaw, the Court was addressing the inverse situation: representatives ignoring much of their constituency in favor of one group of constituents, rather than out-of-district concerns. Id. Appellants read Holt and Shaw out of context and they do not provide authority for this Court to uphold Measure 6.
 
 V. Conclusion
 
 18
 Measure 6 does not survive scrutiny under the First Amendment and is not saved by the argument that it protects the republican form of government.
 
 
 19
 The District Court's Opinion and Order and its Declaratory Judgment and Mandatory Injunction are AFFIRMED.
 
 
 20
 BRUNETTI, Circuit Judge, concurring in part and dissenting:
 
 
 21
 The state of Oregon amended its constitution to prohibit state candidates from using or directing any contributions from out-of-district residents and to penalize candidates when more than 10% of their total "funding" comes from such individuals. The amendment was challenged under several provisions of the constitution and was struck down, in a summary judgment order, by the district court under the First Amendment. Viewing the evidence in a light most favorable to appellants, we review the award of summary judgment de novo, Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995).
 
 I.
 
 22
 In November of 1994, the voters of Oregon amended their constitution by passing Ballot Measure 6 ("Measure 6"). Measure 6 provided:
 
 Be it enacted by the People of Oregon:
 
 23
 SECTION 1. For purposes of campaigning for an elected public office, a candidate may use or direct only contributions which originate from individuals who at the time of their donations were residents of the electoral district of the public office sought by the candidate, unless the contribution consists of volunteer time, information provided to the candidate, or funding provided by the federal, state, or local government for purposes of campaigning for an elected public office.
 
 
 24
 SECTION 2. Where more than ten percent (10%) of a candidate's total campaign funding is in violation of Section (1), and the candidate is subsequently elected, the elected official shall forfeit the office and shall not hold a subsequent elected public office for a period equal to twice the tenure of the office sought. Where more than ten percent (10%) of a candidate's total campaign funding is in violation of Section (1) and the candidate is not elected, the unelected candidate shall not hold a subsequent elected public office for a period equal to twice the tenure of the office sought.
 
 
 25
 SECTION 3. A qualified donor (an individual who is a resident within the electoral district of the office sought by the candidate) shall not contribute to a candidate's campaign any restricted contributions of Section (1) received from an unqualified donor for the purpose of contributing to a candidate's campaign for public office. An unqualified donor (an entity which is not an individual and who is not a resident of the electoral district of the office sought by the candidate) shall not give any restricted contributions of Section (1) to a qualified donor for the purpose of contributing to a candidate's campaign for elected office.
 
 
 26
 SECTION 4. A violation of Section (3) shall be an unclassified felony.
 
 
 27
 Although Measure 6 does not expressly limit its application to state races, it amends Article II of the state constitution which governs state elections. The parties do not argue Measure 6 applies to federal elections and to the extent it attempted to do so, it would be preempted by the Federal Election Campaign Act.
 
 
 28
 Plaintiffs sought a declaratory judgment that Measure 6 is facially unconstitutional. Plaintiffs VanNatta, Gill, and the Center To Protect Free Speech ("Center") claimed that they wished to contribute to out-of-district candidates, Plaintiff Boehnke claimed that he wished to accept donations from non-residents of his district, Plaintiff Smith claimed that he refused donations from plaintiffs Gill and VanNatta because of Measure 6. Several parties intervened including Gordon Miller, the sponsor of Measure 6, who was allowed to intervene for the purpose of appealing the district court's judgment.
 
 
 29
 Defendants presented considerable evidence demonstrating the prevalence of political action committee money in Oregon state races. As of 1992, candidates spent an average of $38,000 on state house races and $49,000 on state senate races. House candidates received 81% of their money from PACs and corporations, senate candidates received 75% from those sources. Individual contributors accounted for 13% of contributions in house races and 15% in senate races in 1992. Defendants also presented statistical and anecdotal evidence suggesting a strong correlation in Oregon between receiving funds and winning elections.
 
 
 30
 The district court granted summary judgment for the plaintiffs. Applying strict scrutiny, the court rejected the measure as not narrowly tailored to prevent corruption because it prevented non-corrupt out-of-district contributions, failed to thwart in-district corruption, and failed to prevent large out-of-district contributions so long as they do not exceed 10% of the total. Defendants appealed.
 
 II. Applicability of the First Amendment
 
 31
 Contributions to political campaigns are protected speech under the First Amendment. Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Appellants, however, argue that Measure 6 does not burden the rights of contributors VanNatta, Gill, and the Center because it does not prevent the acceptance of contributions, but rather the use of certain contributions by the candidate. Under Measure 6, candidates could accept unlimited donations from out-of-district residents so long as they do not "use or direct" them. While Measure 6's sanctions only apply if 10% of a candidates' "total campaign funding" is in violation, it prohibits the use or direction of any non-conforming contributions.
 
 
 32
 Appellants' argument that contributors are not burdened relies on Buckley v. Valeo, 424 U.S. 1, 21, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), in which the Supreme Court upheld limits on contributions, reasoning that the free speech value of contributing lay in the "symbolic expression of support" not the total amount. Based on that rationale, they argue that Measure 6 in no way detracts from the symbolic act of contributing because it does not prevent contributions, but only the use of contributed money.
 
 
 33
 Appellants' argument only makes sense in the abstract. In reality campaigns will have no incentive to accept money which they cannot legally spend. To do so would invite violations of Measure 6 and a host of potential ethical landmines. In fact, appellees attested that an out-of-district candidate refused to accept their donations because of Measure 6. As the statute has caused campaigns to refuse to accept these unusable contributions, the First Amendment rights of contributors are implicated. See Service Employees Int'l Union, AFL-CIO, CLC v. Fair Political Practices Comm'n, 955 F.2d 1312, 1321 (1992). In Service Employees, this court concluded that time limitations on the amount of contributions a candidate could receive impermissibly discriminated against challengers. Id. It held that contributors had standing to challenge the measure as violating their own First Amendment rights. Id. at 1316. "If Proposition 73 discriminates against challengers by limiting their opportunities to accept contributions, then it necessarily discriminates against contributors who wish to associate themselves with challengers." Id. Cf. Renne v. Geary, 501 U.S. 312, 320, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) ("respondents of course have standing to claim that § 6(b) has been applied in an unconstitutional manner to bar their own speech"). Therefore, Measure 6 does implicate the contributing appellees' First Amendment rights because it limits the ability of candidates to accept their donations. See Service Employees, 955 F.2d at 1321.
 
 III. Level of Scrutiny
 
 34
 Restrictions on contributions to campaigns are subjected to less exacting scrutiny than restrictions on independent expenditures in support of a campaign. Federal Election Commission v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("we have consistently held that restrictions on contributions require less compelling justification than restrictions on independent expenditures"); Service Employees, 955 F.2d at 1322. Thus while contribution limitations are reviewed under a "rigorous" level of scrutiny, they are not reviewed under strict scrutiny. Id. Restrictions on contributions are upheld when the "state demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." Service Employees, 955 F.2d at 1322 (quoting freedom of association analysis in Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). While the test is less stringent than strict scrutiny, "the test is still a rigorous one." Id.
 
 
 35
 Appellees argue that the level of scrutiny should be strict because Measure 6 does more than restrict the amount non-residents can contribute in that it flatly prohibits such contributions.[1] Their argument finds support in Buckley in which the Supreme Court reasoned that the Federal Election Campaign Act's restrictions on contributions were less drastic because they only limited the amount, thereby permitting the symbolic act of contributing to a worthy candidate. 424 U.S. at 21, 96 S.Ct. 612. The Court, however, also noted that contribution limits did not prevent contributors from independently discussing candidates and issues. Id.
 
 
 36
 In any event, this court has applied less-than-strict, rigorous scrutiny to total restrictions on contributions. Service Employees, 955 F.2d at 1322. In Service Employees, we reviewed a California Initiative which banned campaigns from contributing to another campaign. Id. at 1315. We struck down the provision under the rigorous scrutiny derived from Buckley. Thus, under the law of this circuit, we apply rigorous, rather than strict, scrutiny to Measure 6. See id. Measure 6 can survive rigorous scrutiny only if it is closely drawn to advance a sufficiently important interest. Id.
 
 
 37
 The National Voting Rights Institute ("Institute") argues in its amicus brief that the statute should be reviewed under the balancing test laid out in Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). In Anderson, the Court considered challenges to candidate filing deadlines. The Court noted that while voters' free speech rights are affected by restrictions on candidates, the process of managing elections necessarily involves extensive state regulation. 460 U.S. at 788, 103 S.Ct. 1564. The Court articulated a framework for weighing the competing interests affected by election laws. Id. at 789, 103 S.Ct. 1564. The Supreme Court has not applied this test to campaign contribution restrictions which more directly infringe on speech rights and which are not necessarily an integral aspect of a state's management of elections. Thus the rigorous test outlined in Service Employees is the appropriate level of scrutiny.
 
 IV. Measure 6
 Sufficiently Important State Interest
 
 38
 There are essentially two purported interests advanced by Measure 6. One is corruption. As the district court concluded, Measure 6 is both under-inclusive and over-inclusive with respect to curbing corruption and thus corruption is an insufficient state interest to sustain the measure. A second interest, which appellants describe in several different ways, involves protecting the integrity of republican government by assuring that constituents are truly selecting their representatives.
 
 A. Curbing Corruption
 
 39
 The district court defined the state's interest in Measure 6 as preventing political corruption. The court then rejected the measure as not being narrowly tailored to prevent corruption because it prevented non-corrupt out-of-district contributions, failed to thwart in-district corruption, and failed to prevent large out-of-district contributions so long as they do not exceed 10% of the total.
 
 
 40
 Even applying the less stringent rigorous test, to the extent one views the state's interest as preventing corruption, Measure 6 still fails to pass scrutiny for the reasons stated by the district court. See Service Employees, 955 F.2d at 1312. The Supreme Court has defined corruption associated with campaign contributions as "financial quid pro quo: dollars for political favors." FEC v. National Conservative PAC, 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). In Service Employees, this court rejected California's asserted interest in preventing corruption as a justification for banning intra-campaign donations. Id. Citing Buckley, the court reasoned that corruption stems from large campaign donations and not small ones. Id. As the California initiative did not distinguish on the basis of size of donation, this court concluded that the measure was not closely drawn. Id.
 
 
 41
 The Service Employees rationale is equally applicable here. Measure 6 bans all out-of-district donations, regardless of size or any other factor that would tend to indicate corruption. Appellants are unable to point to any evidence which demonstrates that all out-of-district contributions lead to the sort of corruption discussed in Buckley. See Harwin v. Goleta Water Dist., 953 F.2d 488, 490 (9th Cir.1991) (government did not show that ordinance's distinction between contributions from applicants and opponents served to prevent either corruption or the appearance of corruption). Carver v. Nixon, 72 F.3d 633, 644 (8th Cir.1995) (holding limits on the size of contributions were not closely drawn to reducing corruption as state made no showing that small contribution limits were necessary to curb corruption). Measure 6 is not closely drawn to advance the goal of preventing corruption and under this analysis fails to pass muster under the First Amendment.
 
 
 42
 Judge Ferguson and Judge King adopt this conclusion. To this point, the panel is unanimous.
 
 B. Republican Form of Government
 Judge BRUNETTI, dissenting:
 
 43
 At this point I must part with Judge Ferguson and Judge King with regard to the appellant's portrayal of the state's interest not so much as preventing corruption but as presenting a distortion of the state's republican form of government. The majority opinion rejects this argument, however, I conclude that Oregon has a sufficiently important interest in protecting its republican form of government and I dissent from the affirmance of the district court.
 
 
 44
 Appellant argues that Measure 6 advances this interest by preventing those who are ineligible to vote from influencing the outcome of elections. We can consider any interest which Measure 6 serves in assessing the constitutionality of the provision. Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 71, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983).
 
 
 45
 In several cases the Supreme Court has emphasized the right of states and cities to reserve their political processes and resources for their own residents. In Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 70, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), the Court upheld Alabama legislation that extended police and other city powers over non-residents living within three miles of city borders. The Court concluded that the state did not have to provide those non-residents with the right to vote in city elections. Id. at 70, 99 S.Ct. 383.
 
 
 46
 The Holt Court emphasized that it was not enough for the non-residents to show that they were affected by the city's policies because many non-residents are affected by many cities' decisions. Id. at 69, 99 S.Ct. 383. Regardless of those extraterritorial effects, non-residents do not have a right to "participate in the political processes bringing it about." Id. "[O]ur cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." Id. at 68, 99 S.Ct. 383.
 
 
 47
 Similarly, in Martinez v. Bynum, the Court upheld a Texas provision that allowed public schools to deny access to children who live apart from their parents if the child's presence in the district is "for the primary purpose of attending free public schools." 461 U.S. 321, 323 n. 1, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983). The Court reasoned that the measure furthered "the substantial state interest in assuring that services provided for its residents are enjoyed only by residents." Id. at 328, 103 S.Ct. 1838.
 
 
 48
 In other contexts the Supreme Court has suggested, sometimes strongly, that states have a strong interest in ensuring that elected officials represent those who elect them. See, e.g., Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 2828, 125 L.Ed.2d 511 (1993) (elected officials representing one interest group rather than their entire constituency is a cognizable harm under the fourteenth amendment). In Shaw, the Court was addressing the inverse situation: representatives ignoring much of their constituency in favor of one group of constituents, rather than out-of-district concerns. Id. The analysis, however, underscores the importance of preserving the ties between elected officials and those who elect them. See id.
 
 
 49
 In Austin v. Michigan Chamber of Commerce, the Court upheld a statute which prohibited all corporations, not just out-of-district, from spending money from their general funds on elections. 494 U.S. 652, 668, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). ("The Act does not attempt to equalize the relative influence of speakers on elections, rather it ensures that expenditures reflect actual public support for the political ideas espoused by corporations ... corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, just as it can when it assumes the guise of political contributions"). Id. at 660, 110 S.Ct. 1391. While the Court did not discuss what is meant by "actual public support," in the context of protecting elections from unfair influences, the concept is by definition limited to those who are eligible to vote, i.e. district residents. See id.
 
 
 50
 In voting cases, the Court has emphasized both the need for equal representation as well as the latitude states have in determining requirements for voting. Board of Estimate of City of New York v. Morris, 489 U.S. 688, 694, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989); Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) ("states have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised"). In Morris, the Court struck down a New City municipal board which afforded each borough of the city equal representation despite substantial differences in population. In doing so, the Court emphasized that equal representation was crucial to assuring that each citizen equally participates in government because voting is the only way in which most residents participate in the political process. Morris, 489 U.S. at 693, 109 S.Ct. 1433. In Carrington, the Court struck down a Texas statute which prevented service personnel from voting so long as they remained active members in the military. 380 U.S. at 97, 85 S.Ct. 775. The Court, however, reaffirmed the wide latitude enjoyed by states in establishing residency requirements, as long as the states do not violate the fourteenth amendment. Id. at 91, 85 S.Ct. 775.
 
 
 51
 While none of the cases discussed above are directly on point, taken together they suggest that a state has a sufficiently strong interest in protecting the integrity of electoral district lines. If states have flexibility in determining who is a resident for voting purposes and in taking steps to make sure non-residents do not have access to some state services, it follows that states also have a strong interest in making sure that elections are decided by those who vote. The Supreme Court has come very close to saying as much in Shaw, Holt, and Austin. With the increasing importance of fundraising in elections generally, Buckley, 424 U.S. at 19, 22, 96 S.Ct. 612, and in Oregon in particular, elections are for all intents and purposes are often decided well before any resident steps into a voting booth.
 
 
 52
 Thus the Supreme Court's traditional emphasis of states' interest in managing elections, assuring that only residents vote, and safeguarding resources for bona fide residents supports Measure 6 because appellants have presented considerable evidence that campaign financing strongly influences Oregon elections. As this was a grant of summary judgment for appellees, that evidence must be viewed in the light most favorable to appellants. Warren, 58 F.3d at 441. Furthermore, under rigorous scrutiny the state need only demonstrate a sufficiently important interest. Service Employees, 955 F.2d at 1322. I conclude that Oregon has a sufficiently important interest in protecting republican government by ensuring that elections are truly a measure of the preferences of those eligible to vote.
 
 
 53
 The inquiry thus turns to whether Measure 6 is closely drawn to serve this interest. Id. Legislation is closely drawn when it is not over or under inclusive. See id. Appellees primarily contend that protecting representative government is not a compelling interest. They also maintain, however, that Measure 6 is underinclusive because it permits in-district donations that "far exceed the candidate's 'actual support within the district' " and overinclusive because it prevents small out-of-district contributions "that could not possibly erode or even appear to erode anyone's vote."
 
 
 54
 The underinclusive argument misses the mark. The fact that some in-district residents will donate more than others does not detract from the state's interest in ensuring that elections are truly a forum for constituents to select a representative. The Supreme Court has cautioned against trying to equalize voices based on wealth. Buckley, 424 U.S. at 48-49, 96 S.Ct. 612. Even if a small group of in-district residents who hold a minority viewpoint contribute a majority of a candidates' donations, the decision-making process has remained entirely within the district.
 
 
 55
 The overinclusive argument is stronger. Appellees frequently refer to the hypothetical candidate's out-of-district mother who wants to donate a dollar to her child's campaign. To the extent that one views the state's interest as preventing non-residents from unduly influencing the outcome of an election, Measure 6 is over-inclusive in that it prohibits donations which will have no influence.
 
 
 56
 The state's interest, however, is more appropriately characterized as ensuring that only those who are constituents participate in the electoral process. Toward that end, Measure 6 is not over-inclusive in that it prohibits every non-district resident, but no residents, from participating in the electoral process. See Harwin, 953 F.2d at 490. Unlike the Goleta Water District in Harwin, appellants have presented considerable evidence indicating that out-of-district contributions determine in-district elections and thus have shown that the distinction serves the government's interest. See id.
 
 
 57
 Moreover in Austin, the Court rejected an overinclusiveness argument that not all corporations have vast resources. 494 U.S. at 661, 110 S.Ct. 1391. "We accept Congress' judgment that is it the potential for such influence that demands regulation." Id. Measure 6 is a manifestation of the state of Oregon's judgment that out-of-district donations have the potential for undue influence. Under Austin, there is precedent for according that judgment considerable deference. As the rigorous test requires only that the measure be closely drawn to advance the interest, rather than narrowly tailored, Measure 6 is sufficiently closely drawn to survive rigorous scrutiny.
 
 
 58
 Appellees argue that the measure denies out-of-district residents and out-of-state residents any voice in matters which may strongly affect their interests. In Buckley, however, the Supreme Court emphasized the more limited speech value associated with contributions as opposed to direct expenditures:
 
 
 59
 By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication ... While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.
 
 
 60
 424 U.S. at 20-21, 96 S.Ct. 612. Part of the Buckley court's analysis emphasized that in only limiting the amount of contributions the Act still allowed the symbolic gesture of contributing. Id. In striking down expenditure limitations, however, the Court commented that they "limit political expression at the core of our electoral process and of the First Amendment freedoms." Id. at 39, 96 S.Ct. 612. See also Massachusetts Citizens, 479 U.S. at 259-60, 107 S.Ct. 616 ("we have consistently held that restrictions on contributions require less compelling justification than restrictions on independent expenditures").
 
 
 61
 Nothing in Measure 6 prevents out-of-district and out-of-state residents from making independent expenditures on behalf of candidates and issues. Appellee discusses stockholders and state employees as two groups that will be denied "any voice" in state elections under Measure 6. That argument is plainly false because these groups will be allowed to make independent expenditures in an effort to persuade the voters of Oregon that a particular candidate should be elected or a particular issue warrants closer attention. See Austin, 494 U.S. at 660, 110 S.Ct. 1391 (the act was not an absolute ban because it permitted independent expenditures from segregated funds). Thus while it could be argued that cases like Holt, which allows cities to exercise jurisdiction over non-residents, heighten the need for non-resident participation in elections through contributions, non-residents can always resort to independent expenditures.
 
 
 62
 Appellees also rely heavily on Whitmore v. Federal Election Commission, 68 F.3d 1212, 1216 (9th Cir.1996). In Whitmore, a third party candidate sought an injunction ordering candidates not to accept out-of-state contributions because such contributions violate their right to republican government. Id. The court held that the claim was frivolous noting that neither the constitution nor the federal statutes provide any support. Id. The court went on to note that the district court could not have granted the injunction in view of contributor's First Amendment rights. The amended opinion concluded that "such management of the system of political expression may violate the rights of out-of-state contributors." Id. (emphasis added).
 
 
 63
 The use of the word "may" indicates that the Whitmore court did not intend to resolve the First Amendment rights of the contributors. It was sufficient for them to hold that federal law did not prohibit out-of-state contributions. That holding has no bearing on this case because Measure 6 does prohibit out-of-state contributions and thus, unlike in Whitmore, the question of whether such a prohibition is in violation of the First Amendment is squarely before this court.
 
 
 64
 The Whitmore court was apparently concerned about the Supreme Court's admonition in Buckley against states favoring the speech of certain segments of the population. 68 F.3d at 1216. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." Buckley, 424 U.S. at 48-49, 96 S.Ct. 612.
 
 
 65
 Measure 6 clearly favors the voices of in-district residents over those of out-of-district residents but no more so than residency requirements for voting. In Buckley, however, the Court was considering a proposal that attempted to limit the ability of the wealthy to drown out the voices of those with fewer resources. 424 U.S. at 48, 96 S.Ct. 612. Measure 6 discriminates only on the basis of in-district residency and only affects contributions, not independent expenditures.
 
 
 66
 Finally, it is important to note that Measure 6 does not prevent the hypothetical candidate from donating to her child's campaign. Measure 6 does prohibit her child from using the funds but only penalizes a candidate when more than 10% of his "total campaign funding" is in violation of the provision. Thus while the statute inhibits out-of-district donations such that it implicates the First Amendment, it does not require our hypothetical candidate to return his mother's donation. The 10% floor thus essentially functions as a savings clause.
 
 V.
 
 67
 States cannot pick and choose among voices in an effort to create an even playing field but they may take steps to ensure the integrity of political structures and processes. While Measure 6 affects protected speech, it more closely resembles the latter category of state actions and therefore survives rigorous scrutiny under the First Amendment, and I would reverse the District Court's Opinion and Order and vacate its Declaratory Judgment and Mandatory Injunction.
 
 
 
 *
 Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Appellants are in disagreement over the level of scrutiny. The state argues that less than strict scrutiny should be applied. Appellant Miller, however, concedes that strict scrutiny is applicable because he understands Measure 6 to be a contribution limit on candidates. Miller relied on the discussion in Buckley of limits on personal expenditures by candidates. However, nothing in Measure 6 prevents candidates from spending their own money or unlimited amounts of money contributed by in-district residents. Cf. Opinion of the Justices to the House of Representatives, 418 Mass. 1201, 637 N.E.2d 213, 216 (1994) (advisory opinion) (concluding that aggregate limit on total contributions was an expenditure limit). Thus Measure 6 is a restriction on contributions and should be evaluated as such